# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| **UNITED STATES OF AMERICA,**<br><br>　　　　**Plaintiff,**<br><br>　　v.<br><br>**GUIA CABACTULAN, MARISSA DUENAS, and AMANDA ESTOPARE,**<br><br>　　　　**Defendants.** | **Case No.: MJ 20-00354-DUTY**<br><br>**ORDER OF DETENTION FOR DEFENDANT GUIA CABACTULAN** |

## I.　INTRODUCTION

On January 27, 2020, the Government filed a criminal complaint against Defendants Guia Cabactulan, Marissa Duenas, and Amanda Estopare, alleging a criminal conspiracy in violation of 18 U.S.C. § 371. (Dkt. 1 [hereinafter "Compl."].) On January 30, 2020, Defendant Cabactulan made her initial appearance before the Honorable

-1-

Autumn D. Spaeth, United States Magistrate Judge. (Dkt. 19.) Judge Spaeth conducted a pretrial detention hearing and ordered Cabactulan detained pending trial, finding that she was a flight risk and a danger to the community. (*Id.*) Cabactulan now moves for review of Judge Spaeth's detention order and for release on bail. (Dkts. 8, 27.)[1]  For the following reasons, Cabactulan's motion is **DENIED**.

## II. BACKGROUND

On February 12, 2020, a grand jury returned an indictment charging Cabactulan with a criminal conspiracy in violation of 18 U.S.C. § 371. Specifically, it charges that she conspired to commit the following human trafficking and immigration offenses: (1) Trafficking with Respect to Forced Labor in violation 18 U.S.C. § 1590(a); (2) Document Servitude in violation of 18 U.S.C. § 1592(a)(3); (3) Immigration Fraud in violation of 18 U.S.C. § 1546(a); and (4) Marriage Fraud in violation of 8 U.S.C. § 1325(c).

The criminal complaint and indictment allege the following facts. Defendants were part of a human trafficking ring orchestrated by their employer, the Philippines-based Kingdom of Jesus Christ church ("KOJC"). Defendants submitted fraudulent visa applications on behalf of KOJC "volunteers" from the Philippines. Once the "volunteers" arrived in the United States, Defendants confiscated their passports and forced them to work long hours soliciting donations for a fraudulent charity. These donations were funneled to the KOJC's leadership in the Philippines to support their personal expenses and purchase luxury items. Specifically, KOJC's senior leader has

---

[1] The Court considers the instant motion as the presiding Criminal Duty Judge. The Court initially denied without prejudice Cabactulan's motion so that the District Court Judge who would soon be permanently assigned to this case could review Judge Spaeth's detention order. (Dkt. 24.) After the parties fully briefed the issues, however, the Court agreed to move forward with the instant review and held a hearing on February 12, 2020. (Dkt. 32.)

used these donations to build a stadium and compound in Davao City (the "Kingdome") and to purchase a private jet, helicopters, and luxury vehicles.

"Volunteers" were forced to work nearly every day, year-round. They lived in KOJC's compound in Van Nuys, California, but were not otherwise compensated. "Volunteers" were also forced travel across the country soliciting donations, sleeping in cars without access to basic necessities. Cabactulan set quotas for their daily solicitations, and, if they failed to meet their quotas, workers were mentally and physically abused, beaten with paddles, isolated, and forced to fast. Victims also report being punished for leaving the KOJC, for having relationships with non-KOJC members, and for making negative statements about leadership. Female victims were pressured to have sex with KOJC's senior leader, which is referred to as "night duty." Workers that were effective at soliciting donations were pressured into sham marriages with KOJC members so that they could continue working. Defendants orchestrated these sham marriages, as well as divorces and remarriages, to build KOJC's workforce. Bank records and other evidence suggests that KOJC workers collected approximately $20 million in donations between 2014 and 2019.

Cabactulan was allegedly the lead administrator for KOJC's United States operations, operated the KOJC compound in Van Nuys, and supervised Defendants Duenas and Estopare. She was in direct communication with KOJC leadership and at various points was personally responsible for tracking and reporting the money raised by KOJC "volunteers," coordinating sham marriages, withholding victims' passports, providing KOJC workers with prepared scripts and letters for immigration officials, and responding to inquiries from immigration officials about KOJC's operations.

//

//

## III. ANALYSIS

The Bail Reform Act permits pretrial detention only upon certain findings. 18 U.S.C. §§ 3142, *et seq*. "The whole spirit of the Bail Reform Act . . . is that a defendant facing trial should be released, rather than detained, unless there are strong reasons for not releasing him." *United States v. Honeyman*, 470 F.2d 473, 474 (9th Cir. 1972). The burden rests with the Government, which must prove by a preponderance of evidence that the defendant poses a serious risk of flight and by clear and convincing evidence that the defendant poses a danger to the community. *See* 18 U.S.C. §§ 3142(e), (f); *United States v. Gebro*, 948 F.2d 1118, 1121 (9th Cir. 1991). The Government must also show that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e). In determining whether to release or detain a defendant, the Court considers (i) the nature and circumstances of the offenses charged, (ii) the weight of the evidence against the defendant, (iii) the history and characteristics of the defendant, and (iv) the nature and seriousness of the danger to the community. 18 U.S.C. § 3142(g).

After considering these factors and the evidence presented by the parties and the arguments of their counsel, the Court concludes the Government has met its burden. Consequently, Cabactulan must be detained pending trial.

### A. Flight Risk

The Court finds by a preponderance of the evidence that Cabactulan is a serious flight risk and that no condition or combination of conditions will reasonably assure her appearance as required.[2]

---

[2] Pretrial Services also recommends detention based on its finding that no condition or combination of conditions will reasonably assure Cabactulan's appearance as required.

First, Cabactulan has a powerful incentive to flee the country. She is accused of coordinating the United States operations of an international human trafficking ring and operating the compound where victims were held against their will. In one email, she is identified as overseeing the "Northern Command" of KOJC's "Full Time Workers and Members." If convicted of a conspiracy to commit these human trafficking and immigration offenses, she faces a statutory maximum of five years in prison. Based on the available evidence, the government estimates that the guideline range for her sentence would be 108 to 135 months—well above the statutory maximum.

More fundamentally, the charges against her pose an existential threat to KOJC—Cabactulan's employer, her community, and her home for the last fourteen years. If convicted, the instant charges will upend her life. Her livelihood is entirely dependent on KOJC. Cabactulan has lived at KOJC's Van Nuys compound since 2006. She has worked for KOJC since at least 2013. Her monthly salary from KOJC is $5,000, but she receives only $1,900 after the organization deducts housing, clothing, and living expenses. Cabactulan has no property, no savings, and no other income. She also has no family in the United States and no connections or ties in the Central District outside KOJC. She is separated from her husband, who is a KOJC member and lives at the Van Nuys compound. Her first proposed surety was her roommate, another KOJC member living at the compound. At the Court's hearing, she proposed two new sureties—Mr. and Mrs. Carlos—who are also KOJC members. She asserted that Mr. and Mrs. Carlos could offer her temporary housing outside of the KOJC compound, but not on a long-term basis. Pretrial services was unable to confirm this information with Mr. Carlos. Because of her senior role, Cabactulan could be pressured to flee to protect the organization if released on bail. Cabactulan could also decide that, with KOJC in jeopardy, she has no choice but to flee, regardless of any conditions of release imposed by the Court.

Second, Cabactulan has the means, resources, and connections to flee. KOJC has millions of dollars, a private plane, helicopters, and an international network capable of moving money and people across international borders. For example, in 2018, a KOJC administrator was arrested after law enforcement found more than $330,000 wrapped in socks on a KOJC-owned private plane. On January 29, 2020, federal agents found approximately 72 passports from the Philippines, seven United States passports, and one Ukranian passport in Cabactulan and Duenas's shared office at the Van Nuys compound. Cabactulan has a direct line of communication with KOJC's leadership in the Philippines and is responsible for transferring funds within the organization. In this role, she has helped KOJC's leaders raise millions of dollars through fraudulent charities. The charges against her threaten the organization's most senior leadership. For example, the government cites spreadsheets created by Cabactulan that track the transfer of tens of thousands of dollars from volunteer teams to the "Executive Pastor." KOJC's leadership in the Philippines therefore has a strong incentive to protect themselves by helping or, indeed, forcing Cabactulan to flee the United States.

Third, Cabactulan has strong personal ties to the Philippines. She was born and spent most of her adult life in the Philippines and still has family living there. Cabactulan is a citizen of the Philippines and has a passport from the Philippines. From 2015 through 2017, Cabactulan travelled there annually to visit family.

Fourth, the evidence shows that Cabactulan has a sophisticated understanding of the immigration system, the skills to manipulate that system, a history of defrauding immigration officials, and a clear disregard for the rule of law. Specifically, it shows that Cabactulan coached KOJC members through immigration inquiries, sent them scripts, and coordinated their responses. She also fielded phone calls about KOJC from immigration officials and submitted fraudulent visa applications and marriage paperwork. The government has also presented evidence of more recent attempts to evade and

mislead federal officials. After she learned about an investigation of KOJC in Hawaii, Cabactulan executed a rental agreement in Panorama City to store victims' identifying documents outside the Van Nuys compound. This conduct, if true, is strong evidence that she will not appear as required if released on bond.

### B. Danger to the Community

The Court also finds by clear and convincing evidence that no condition or combination of conditions will reasonably assure the safety of the community if Cabactulan is released. Put simply, the evidence suggests that KOJC operates a human trafficking ring and abuses victims for violating the terms of their confinement. Cabactulan played a key role in this organization and is alleged to have personally confiscated and withheld the passports of victims and their children, pressured victims into sham marriages, and forced them to release custody of their children. In March 2018, Cabactulan and Duenas allegedly refused to provide a victim with her green card until she wrote and signed a letter stating that her work at KOJC was voluntary.

Releasing Cabactulan on bail would create an unmitigated risk for KOJC workers and the community at large. Victims report serious physical and psychological abuse at the hands of KOJC. One victim reports that Cabactulan informed KOJC leadership that she was having a relationship with a non-KOJC member, which led to severe punishment. Specifically, the victim reports that she was sent to the "Upper Six" at the Van Nuys compound, where she was isolated and forced to fast and listen to prerecorded sermons for at least three days. Another victim reports having her head shaved and being forced to wear an orange shirt with "SOS"—for "Son of Satan"—on the back. This victim also reports being hit on the back with a paddle approximately 100 times during her first day in isolation.

As discussed above, the Government evidence shows that no combination of conditions could mitigate the risk of Cabactulan contacting victims and other perpetrators of the alleged human trafficking scheme. Several victims have cooperated with law enforcement and made statements to federal officials. Others may attempt to contact federal agents soon. The Court finds that allowing Cabactulan to return to the compound would create an unmitigated risk of harm to KOJC "volunteers" and the community.

**IV. CONCLUSION**

For the foregoing reasons, Defendant Cabactulan's motion is **DENIED**.

**IT IS THEREFORE ORDERED** that Defendant Cabactulan be detained prior to trial.

**IT IS FURTHER ORDERED** that Defendant Cabactulan be committed to the custody of the Attorney General for confinement in a corrections facility separate, to the extent practicable, from persons awaiting or serving sentences or being held in custody pending appeal.

**IT IS FURTHER ORDERED** that Defendant Cabactulan be afforded reasonable opportunity for private consultation with counsel.

*//*
*//*
*//*
*//*
*//*
*//*

**IT IS FURTHER ORDERED** that, on order of a Court of the United States or on request of any attorney for the Government, the person in charge of the corrections facility in which Defendant Cabactulan is confined deliver her to a United States marshal for the purpose of an appearance in connection with a court proceeding.

DATED: February 14, 2020

_____
CORMAC J. CARNEY
UNITED STATES DISTRICT JUDGE